## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMELINA CARMEN AGUAYO, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 05-CV-7717 (JGK) |
| v. | ECF Case |
| REPUBLIC OF ITALY, LEHMAN BROTHERS, INC., GOLDMAN SACHS INTERNATIONAL, MERRILL LYNCH INTERNATIONAL, CITIGROUP GLOBAL MARKETS, INC., UBS AG, UBS LIMITED, DEUTSCHE BANK AG, CREDIT SUISSE FIRST BOSTON (EUROPE) LTD., J.P. MORGAN SECURITIES LTD., MORGAN STANLEY & CO. INTERNATIONAL, INC., NOMURA INTERNATIONAL plc, AND BNP PARIBAS, | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | |

## INTRODUCTION

1. This is a federal class action on behalf of purchasers of debt securities issued by the Republic of Italy ("Italy") and registered with the United States Securities and Exchange Commission ("SEC") between September 3, 2002 and April 28, 2005 inclusive (the "Class Period") to pursue claims under the Securities Act of 1933 (the "Act") against Italy and certain of the underwriters of the aforesaid securities.

## OVERVIEW

2. Throughout the Class Period, Italy issued debt securities pursuant to registration statements filed with the Securities and Exchange Commission ("SEC").

3.     Each of the registration statements filed during the Class Period (including all SEC filings deemed to be registration statements) were and are defective in that they contain materially inaccurate statements and/or omissions concerning Italy's reported deficits and reporting of deficits. In particular, each registration statement understated Italy's debt, so that Italy could report that it complied with the European Union requirement that debt be limited to 3% of gross domestic product. In fact, as was reported in Business Week of August 1, 2005, Italy's budget deficit breached the European Union's 3% debt ceiling in four of the past five years.

4.     The value of Italian debt securities has declined since the true extent of Italy's debt relative to its gross domestic product has become known. As a result of the misrepresentations contained in the registration statements, as described herein, as well as the omission of material facts, investors who purchased Italy debt securities during the Class Period have been damaged, and continue to sustain damages.

## JURISDICTION AND VENUE

5.     Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1337 and by Section 22 of the Act, 15 U.S.C. § 77v. The claims asserted herein arise under Section 11 of the Act, id. § 77k.

6.     The action as against defendant Italy is based upon a "commercial activity" (as such term is defined in 28 U.S.C. § 1603(d)) carried on in the United States by Italy or upon an act or acts performed in the United States in connection with a commercial activity of Italy elsewhere, rendering Italy not immune from the jurisdiction of this Court in accordance with the provisions of 28 U.S.C. § 1605(a)(2).

7.     Notwithstanding any purported reservation by Italy of its immunity from jurisdiction in any action arising out of or based on the debt securities involved in this action and

2

brought under the United States securities laws, Italy has waived its immunity from the jurisdiction of this Court by implication, in accordance with the provisions of 28 U.S.C. § 1605(a)(1), by reason of (a) its recourse to SEC action to facilitate the offer and sale of such securities in the United States and elsewhere, and (b) its filings with the SEC of registration statements and other documents covering various of the subject offers and sales, all as more fully alleged and described herein.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), (d), and (f)(1); Section 22 of the Act, 15 U.S.C. § 77v; and, as to defendant Italy alone, its consent to jurisdiction in any action arising out of or based on the debt securities involved herein which may be instituted by any holder of any such debt security in any State or Federal court in The City of New York (assuming Italy's purported reservation of immunity from jurisdiction in actions brought under the United States securities laws is without effect in this action).

## PARTIES

9.      Plaintiff Emelina Carmen Aguayo, as set forth in the accompanying certification, incorporated by reference herein, purchased Italy debt securities during the Class Period, and was damaged thereby.

10.     Defendant Republic of Italy is a sovereign government, and as such is a "person" subject to the Securities Act as defined in 15 U.S.C. §77b(2). It is the issuer of the debt securities involved in this action.

11.     Defendant Merrill Lynch International Inc. ("Merrill Lynch") is incorporated in Delaware, and has its principal office at 225 Liberty St., New York, New York 10281 in this District.

12.     Defendant UBS AG is a Swiss *aktiengesellschaft* with its New York Branch at 101 Park Ave., New York, New York, 10178 in this District.

3

13.     Defendant UBS Limited is a subsidiary of UBS AG, a Swiss company which has its principal United States office at 101 Park Ave., New York, New York 10178 in this District.

14.     Defendant Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc ("Citigroup"). is a Delaware corporation with its principal office at 399 Park Avenue, New York, New York 10022 in this District.

15.     Defendant Lehman Brothers, Inc. ("Lehman") is a Delaware corporation with its principal office at 745 Seventh Avenue, New York, New York 10019-6801 in this District.

16.     Defendant Lehman Brothers International (Europe) ("Lehman International") is a United Kingdom registered broker-dealer, and a downstream subsidiary of Lehman Brothers Holdings Inc., a Delaware corporation with its principal office at 745 Seventh Avenue, New York, New York 10019-6801 in this District.

17.     Defendant JP Morgan Securities Ltd. ("JP Morgan") is incorporated in Delaware with its principal office at 270 Park Ave., New York, New York 10017 in this District.

18.     Defendant Deutsche Bank AG London ("Deutsche Bank London") is a London-based subsidiary of Deutsche Bank AG, a German *aktiengesellschaft* ("Deutsche Bank")

19.     Defendant Deutsche Bank has its United States office at 1301 Avenue of the Americas, New York, New York 10019 in this District.

20.     Defendant Credit Suisse First Boston (Europe) Limited ("CSFB") is a European Broker-dealer and a subsidiary of Credit Suisse Group, an international financial services company that has extensive operations in this District.

4

21. Defendant Goldman Sachs International ("Goldman") is a United Kingdom firm and a wholly-owned subsidiary of Goldman Sachs, Inc., a Delaware corporation with its principal office at 85 Broad St., New York, New York 10004-2456 in this District.

22. Defendant Morgan Stanley & Co., International Ltd. ("Morgan Stanley") is a subsidiary of Morgan Stanley, a Delaware corporation with its principal office at 1585 Broadway, New York, New York 10001 in this District.

23. Defendant Nomura International plc ("Nomura") is a London-based subsidiary of Nomura Holdings Co., a Japanese holding company. Nomura Holdings Inc. has its principal United States office at 2 World Financial Center, New York, New York 10281 in this District.

24. Defendant BNP Paribas is a French investment banking and underwriting firm.

25. Merrill Lynch, UBS AG, UBS Limited, Citigroup, Lehman, Lehman International, JP Morgan, Deutsche Bank London, Deutsche Bank, CSFB, Goldman, Morgan Stanley, Nomura, and BNP Paribas are referred to collectively herein as the "Underwriters." Each is named as a defendant in this action because each served as a lead underwriter on one or more of Italy's bond issuances covered by registration statements and other documents filed with the SEC during the Class Period. By consenting to be listed as an underwriter on one or more Registration Statements filed with the SEC, each acknowledged that its actions in connection with such underwritings were subject to the jurisdiction of the SEC and the courts of the United States. Each Underwriter is liable for the securities violations associated with each debt offering that it underwrote.

5

26.     As alleged more fully below, Underwriters had access to the undisclosed

material information alleged herein concerning Italy's reporting of deficits and were subject to a

statutory duty to conduct a reasonable investigation with regard to the market representations,

including financial reports, contained in each Registration Statement.  Had they conducted such

investigation, they would have found that Italy's reporting of deficits and borrowings was

erroneous or incomplete in light of Italy's issuance of tens of billions of dollars of debt securities

through the Underwriters.

## THE DEBT SECURITIES

27.     The Republic of Italy filed Registration Statements with the SEC during

the Class Period as follows:

| Date | Rate/Maturity | Par Value | Lead Underwriters |
|------|---------------|-----------|-------------------|
| September 3, 2002 (Supplement to Prospectus dated March 14, 2002) | 3.62% due 2007 | \$3 billion | • Merrill Lynch<br>• Citigroup<br>• UBS AG |
| January 17, 2003 | Shelf Registration | — | — |
| January 27, 2003 (Supplement to Prospectus dated January 22, 2003) | 2.50% due 2006 | \$3 billion | • CSFB<br>• Deutsche Bank London<br>• J.P. Morgan |
| February 25, 2003 (Supplement to Prospectus dated January 22, 2003) | 4.75% due 2013<br>5.375% due 2033 | \$2 billion<br>\$2 billion | • Goldman Sachs<br>• Merrill Lynch<br>• Citigroup |
| June 13, 2003 | Shelf Registration | — | — |
| July 1, 2003 (Supplement to Prospectus dated June 16, 2003) | 2.5% due 2008 | \$2 billion | • Lehman<br>• Morgan Stanley<br>• UBS Limited |
| November 7, 2003 (Supplement to Prospectus dated June 16, 2003) | 2.75% due 2006 | \$3 billion | • Deutsche Bank London<br>• Goldman Sachs<br>• Merrill Lynch |
| December 23, 2003 | Shelf Registration | — | — |
| January 9, 2004 (Supplement to Prospectus dated January 6, 2004) | 2.75% due 2006 | \$2 billion | • Deutsche Bank AG<br>• Goldman Sachs<br>• Merrill Lynch |
| February 27, 2004 (Supplement to Prospectus dated February 19, 2004) | 3.25% due 2009 | \$2 billion | • CSFB<br>• J.P. Morgan<br>• Lehman Brothers International |

| Date | Rate/Maturity | Par Value | Lead Underwriters |
|------|---------------|-----------|-------------------|
| June 25, 2004 (Supplement to Prospectus dated February 19, 2004) | 3.75% due 2007 | $2 billion | • BNP Paribas<br>• Lehman<br>• UBS Limited |
| January 18, 2005 (Supplement to Prospectus dated February 19, 2004) | 4.50% due 2015 | $4 billion | • Merrill Lynch<br>• Morgan Stanley<br>• Nomura |

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who

purchased, directly or indirectly, certain debt securities of Italy that had been registered with the

Securities and Exchange Commission during the Class Period (September 3, 2002 through April

28, 2005), and who were damaged thereby. Excluded from the Class are Italy, any of its political

subdivisions, and any agency or instrumentality of any of the foregoing; the Underwriters, their

respective successors or assigns and any entity controlled by or otherwise affiliated with any of

the Underwriters; and any other entity controlled by any excluded person.

29.    The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, the members of the Class purchased beneficial

interests in the securities in the United States, Germany, Switzerland, France, Canada, The

Netherlands and Japan, as well as the Luxembourg stock exchange, where the securities were

listed. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not

thousands, of members in the proposed Class. The owners of beneficial interests in the securities

involved in this action who are members of the proposed Class may be identified through

accounts of financial institutions acting on their behalf as either direct or indirect participants in

The Depository Trust Company ("DTC"), whose nominee, Cede & Co., as such nominee, is the

registered owner of such securities. The owners of the beneficial interests in such securities may be notified of the pendency of this action in the same manner as provided for by the prospectus supplement applicable to those securities, viz., by publication of notice in English in New York in The Wall Street Journal (Eastern Edition), in London in The Financial Times, and, so long as any of the securities involved are listed on the Luxembourg Stock Exchange and the rules of such Exchange shall so require, in a daily newspaper in general circulation in Luxembourg which is expected to be in the Luxembourger Wort. The form of notice to be used would be similar to that which, by applicable rule of court or by custom, shall then be in general use in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the defective registration statements, as alleged herein, violate the Act or any other applicable federal securities laws;

b.      whether the registration statements misrepresented material facts about the Italy's reporting of deficits and/or borrowings;

c.      whether Italy's prospectuses, prospectus supplements, periodic reports, and/or other SEC filings constitute registration statements; and

8

d.     to what extent the members of the Class have sustained damages
and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and
efficient adjudication of this controversy since joinder of all members is impracticable.
Furthermore, as the damages suffered by individual Class members may be relatively small, the
expense and burden of individual litigation make it impossible for members of the Class to
individually redress the wrongs done to them. There will be no difficulty in the management of
this action as a class action.

## BACKGROUND: THE 3% DEFICIT CEILING

34.     The Treaty on European Union (customarily known as, and hereinafter
referred to as, the "Maastricht Treaty") was signed on February 7, 1992 in Maastricht, The
Netherlands, among the members of the European Community and made effective November 1,
1993. The Maastricht Treaty led to the creation of the European Union ("EU") and was the
result of separate negotiations on monetary union and on political union.

35.     The Stability and Growth Pact ("SGP") is an agreement by EU member
states related to their conduct of fiscal policy. The SGP is based on Articles 99 and 104 of the
Maastricht Treaty, and related treaties and decisions. It consists of enforcement policies of
mutual surveillance of fiscal positions and of an Excessive Deficit Procedure ("EDP") defined
therein. The rules of the EDP were established in European Council Regulation Number
3605/93 and now form part of the SGP. The deficit and debt figures of member states are
components of the European aggregate statistics released by Eurostat, the European
Commission's statistical agency.

36.     The SGP was adopted in 1997 so that fiscal discipline would be
maintained and enforced in the EU. Member states adopting the euro have to meet the strict

9

Maastricht Treaty convergence criteria. In particular, member states must respect the following specific criteria: (1) an annual budget deficit lower than 3% of Gross Domestic Product ("GDP"); (2) a public debt lower than 60% of GDP or approaching that value. Failure to meet these criteria triggers the EDP.

37. The Commission of the European Communities ("European Commission") is the executive of the EU. Alongside the European Parliament and the Council of the European Union, it is one of the three main institutions governing the EU. The European Commission's primary roles are to propose and enact legislation, and to act as guardian of the treaties which provide the legal basis for the EU.

38. The European Commission is charged with enforcing the Maastricht Treaty's requirement that member states, including Italy, endeavor to avoid "excessive government deficits" (defined as general government net borrowing in excess of 3% of GDP). EU member states must report their planned and actual deficit and the levels of their debt promptly to the European Commission. The data are reported to Eurostat by March 1 and September 1 each year. The March notification includes the first estimate of the prior calendar year statistics. The notification in September revises the data supplied in March.

39. Pursuant to Article 119 of the Maastricht Treaty, national balance of payments ("BOP") data are an important criterion in the European Commission's assessment of a country's economic situation. The current and capital accounts balance represents the amount of an economy's net foreign investment, or net lending to or borrowing from the rest of the world. This ratio to GDP is a commonly used indicator enabling international data to be easily compared. Regarding the methodological standards used to compile BOP data, all EU member states have adopted the standards set out in the IMF Balance of Payments Manual (5th edition),

10

and largely follow the recommendations made there as well as those laid down by the European

Central Bank ("ECB") and the European Commission for the compilation of the European

aggregate. Further details of this statistical methodology are found in the manuals entitled

"Accession countries: balance of payments/international investment position statistical methods"

and "European Union balance of payments/international investment position statistical methods"

published in May 2003 and November 2003, respectively, and available on the ECB's website.

## ITALY'S REPORTING OF DEFICITS

40. Italy frequently conducts public offerings of its debt securities in the

United States. Italy files shelf registration statements which include a basic prospectus

containing all of the information required by the Securities Act of 1933 (the "Act") and other

information deemed material to investors. The basic prospectus is updated at least annually and

is distributed to prospective dealers and investors as required by the SEC. Specific securities are

offered by a prospectus supplement containing the terms of the offering and a description of any

material recent developments. The prospectus supplement, together with the basic prospectus, is

delivered to purchasers, and all necessary filings are made pursuant to SEC Rule 424 under the

Act. (17 C.F.R. § 230.424).

41. Pursuant to a February 4, 2002 "no-action" interpretive letter requested by

Italy, the SEC effectively approved the implementation of the following procedures for Italy's

issuance of securities:

> 1. Italy will file Annual Reports on Form 18-K ("Annual Reports")
> with the Commission during periods when it desires to have access
> to shelf registration procedures. Such Annual Reports would
> include, as of their respective dates: (i) all of the information and
> exhibits called for by Form 18-K, and (ii) as an additional exhibit
> or exhibits thereto, any additional information required under
> Schedule B to be included in a Schedule B registration statement
> under the Securities Act (except as set forth in the next paragraph)
> together with additional information deemed material to investors.

11

The resulting descriptions of Italy would be substantially as comprehensive as those currently included in Italy's basic prospectus, and such information would be presented in substantially the same format as in that basic prospectus.

The Annual Reports would not include certain Schedule B information, such as the description of securities and plan of distribution. In the case of Italy's existing shelf registration statements and successors thereto, this information would continue to be included in the applicable basic prospectuses and prospectus supplements containing the terms of the offering.

2. Italy's basic prospectus would contain a description of the securities offered thereby, the plan of distribution, the application of proceeds, Italy's debt record, the names and address of Italy's authorized agent in the United States and the name and addresses of counsel who will pass upon the validity of the securities. *The basic prospectus would incorporate by reference the most recently filed Annual Report on Form 18-K of Italy (and all exhibits thereto) and all amendments thereto subsequently filed on Form 18-K/A.*

In order to implement the proposal outlined in this letter, the basic prospectus (or the prospectus supplement, if any, circulated together with such basic prospectus) would contain an undertaking to deliver upon request a copy of the Annual Report on Form 18-K and any other information incorporated by reference. Italy's shelf registration statement currently includes undertakings identical to the undertakings set forth in Item $512(a)(1)$, (2) and (3) and Item $512(i)(1)$ of Regulation S-K. The undertakings currently included in Italy's shelf registration statement obligating Italy to file post-effective amendments (i) to include prospectuses required by Section $10(a)(3)$ of the Securities Act and (ii) to reflect in the basic prospectus any facts or events arising after the effective date of Italy's shelf registration statement (or the most recent post-effective amendment thereto) which, individually or in the aggregate, represent a fundamental change in the information set forth in such registration statement, will be modified so as not to apply if the information required is included in a report under the Exchange Act that has been incorporated by reference. The agreement to provide legal opinions in post-effective amendments would be modified for the purposes of Italy's shelf registration statements so as to permit Italy to furnish such opinions by filing an amendment on Form 18-K/A to the Annual Report on Form 18K.

12

As a result of the foregoing, except as required by the modified undertakings to be included in Italy's registration statements, Italy would not be required to file annual post-effective amendments to its Securities Act registration statements.

3. *At the time when any registered securities are offered to the public, the basic prospectus, together with a prospectus supplement, would be delivered to all purchasers.* Any material recent developments subsequent to the date of the basic prospectus or the most recent Annual Report on Form 18-K, would either be included in (i) a subsequent Annual Report on Form 18-K, or in a Form 18-K/A amendment that is incorporated by reference in the basic prospectus or (ii) the prospectus supplement itself. *Italy will, from time to time, amend its Annual Report on Form 18-K through the use of Form 18-K/A as often as is necessary to disclose material information contained in official budgetary, financial and statistical information and any other material information or developments. Italy anticipates that the time of filing of such Annual Report and such amendments will correspond to the periodic release of official budgetary, financial and statistical information which will provide the basis for the Annual Report and amendments.* At the present time, it is expected that such an amendment typically would be made in July of each year after Italy's financial and statistical information becomes available, and at such other times corresponding to the periodic release of other material official budgetary, financial or statistical information, if any, or to reflect other material developments, if any.

The information and documents that, under current procedures, must be filed by post-effective amendment at the time of an offering (the underwriting terms, any terms agreement, the list of names and addresses of the underwriters, an itemized list of expenses and legal opinions with respect to the securities) would instead be filed on, and incorporated by reference by means of, Form 18-K or amendments thereto on Form 18-K/A.

4. The basic prospectus and prospectus supplement would be delivered to all purchasers of registered securities, and Italy would, pursuant to the undertaking to be included in the basic prospectus, provide to each recipient of such basic prospectus and prospectus supplement, who so requests, a copy of the Annual Report on Form 18-K, together with all exhibits and amendments thereto. Otherwise, unless it chose to do so, Italy would not make an annual public distribution of its Form 18-K, or of the exhibits or amendments thereto, or of its basic prospectus to dealers or

13

> prospective investors as contemplated by the Release. [Emphasis added.]

42.     Among the financial information represented in Italy's registration statement and related filings (in accordance with the issuance procedure set forth above) were Italy's net borrowing statistics. Indeed, these statistics were material to purchasers considering whether or on what terms to purchase securities issued by Italy. The net borrowing statistics correspond to the government deficits which, under the Maastricht Treaty, should not exceed 3% of GDP.

43.     Italy's public debt currently amounts to 106.6% of GDP and is the world's third highest in absolute terms. Given Italy's precarious debt-to-GDP ratio, the European Commission has closely monitored Italy's economic situation. In 2004, the European Commission quietly initiated an internal investigation into Italy's reporting of deficits.

44.     As a result of this investigation, the European Commission produced a confidential internal report pointing out discrepancies in Italy's reporting of deficits. Excerpted below are the "Summary and Conclusions" of the report:

> Following the conclusions of the ECOFIN Council of 5 July 2004 which referred to the need to accelerate the pace of debt reduction and to monitor debt developments and in order to elucidate the persistent debt increasing transactions other than the Maastricht deficit, the Commission submitted a questionnaire to the Ministry of the Economy and Finance on 26 July. The aim of the questionnaire was to obtain clarifications about the largely unexplained trend concerning a part of the stock-flow adjustment. The questions were organized around three major topics: (i) accumulation of financial assets, (ii) cash versus accrual accounting and (iii) statistical discrepancies.
>
> The Italian authorities replied to the questionnaire on 20 September providing information on all the issues raised. Overall, the exercise proved to be useful as it helped clarify some of the points of concern. Moreover, the Italian authorities underlined their effort by pointing to study groups set up in the past by the Government entrusted with the objective to examine a series of

14

questions related to the accounting methods in the public sector. Nevertheless, following the Commission services' assessment, some of the issues raised in the questionnaire would seem to need further clarification.

Concerning the accumulation of financial assets the authorities detailed the capital injections to state owned market companies. However, no information was provided on the same kind of transaction involving other levels of government. As to the rationale of the capital injections, mostly into the railway company and earmarked for investment projects, Italian authorities argue that they are justified first because of the sheer size of the projects coupled with a very long amortization period and second because private financial institutions are not believed to fund the otherwise productive investment. Finally, some qualitative yet not quantitative information is provided concerning loans granted by the general government.

As regards the difference between the cash vs. accrual accounting the authorities clarified the point related to the reimbursement of taxes. Concerning the shortfall of social security contributions in cash terms compared to accrual terms *the explanation provided by the authorities appears not fully consistent. Available information would support the conclusion that the national statistical office (ISTAT) may be underestimating the coefficient that reflects declared amounts never collected in the light of past experience, as required by EU legislation. In relation to the reimbursement of liabilities accumulated in the health-care sub-sector no information is provided about their formation in the past and future trends.*

*The issue concerning the discrepancy across different data sources for the borrowing requirement also remains largely unresolved.* [Emphasis added.]

45.     The report observed that the deficit statistics sent by Italy to Eurostat were

between 0.3 and 1.7 percentage points lower than the real figure, meaning that Italy had run

deficits over the Maastricht Treaty's limit of 3% of GDP every year since 1997. The report

noted that Italy authorities attributed the inconsistency to statistical discrepancies. However, the

European Commission concluded that it was "difficult to justify as mere statistical

discrepancies."

15

46.     The European Commission and Italy continued confidential discussions

concerning these discrepancies in early 2005. In a Prospectus filed by Italy with the SEC on

May 2, 2005, Italy alluded to a potential restatement of its net borrowing statistics:

> On March 18, 2005, Eurostat, the European Commission statistical authority, published a press release detailing government deficit and debt data for the years 2001 through 2004 (including partial estimates for 2004) transmitted by the 25 EU Member States to the Commission as part of the March 1 reporting round under relevant EU regulations. The press release included the following data for Italy:

|                                          | 2001      | 2002      | 2003      | 2004      |
|------------------------------------------|-----------|-----------|-----------|-----------|
| Primary balance, as a percentage of GDP  | 3.6       | 3.2       | 2.4       | 2.0       |
| Public debt (in million euro)            | 1,348,360 | 1,362,074 | 1,383,088 | 1,429,917 |
| Public debt, as a percentage of GDP      | 110.7     | 108.0     | 106.3     | 105.8     |
| Net borrowing (in million euro)          | 35,963    | 32,656    | 37,792    | 40,877    |
| Net borrowing, as a percentage of GDP    | 3.0       | 2.6       | 2.9       | 3.0       |
| GDP (nominal value, in million euro)     | 1,218,535 | 1,260,598 | 1,300,928 | 1,351,794 |

Source: Eurostat

> Eurostat noted that all such data is subject to revision, notably through the further data submission by Member States due by September 1, 2005. ***With respect to Italy, Eurostat noted it was engaged in ongoing discussions with ISTAT, the Italian statistical authority, that could lead to an upward revision in Italy's net borrowing statistics, most notably for 2003 and 2004.*** These ongoing discussions relate to the recording of payments to the Italian government by financial institutions that act as tax collectors (concessionari d'imposta), the sectoral classification of government-owned entities, the treatment of a government securitisation operation, the recording of transactions with the EU budget, inconsistencies between data on cash and accrual bases and statistical discrepancies in government accounts. [Emphasis added.]

47.     Subsequently, on May 18, 2005, according to an EU source cited in AFX

News Limited, the European Commission planned to launch disciplinary action against Italy for

breaching the SGP's deficit limit of 3% of GDP. According to the source, "The decision will be

taken during the meeting of commissioners on June 7 in Strasbourg."

16

48.     The next day, May 19, 2005, the *Corriere Della Sera*, the leading Italian

newspaper published in Milan, reported from Brussels that while in the previous two financial

years Italy's deficit/GDP ratio, a "key parameter" under the Maastricht Treaty, had arrived at the

limits of 2.9% in 2003 and 3% in 2004, now Eurostat is asserting that the numbers would reach

"at least 3.1%" for both periods, which should impose the EDP burden on Italy.  Italy Prime

Minister Silvio Berlesconi protested: "We are tired of the EU bureaucracy.  Darò battaglia.

**[Lit., I will give battle.]"**

49.     On May 23, 2005, Eurostat issued the following press release:

*Decisions of Eurostat on deficit and debt*

*Three decisions on Italy: SCIP, ISPA and Concessionari d'imposta*

Eurostat, the Statistical office of the European Communities, has
taken three decisions related to specific operations undertaken in
Italy. They refer to:

•       the time of recording of government expenditure in the
context of a law establishing the right to compensation from
government for households and for a Special Purpose Vehicle, in
the framework of the SCIP securitisation operations;

•       the recording of the debt issued by Infrastrutture S.p.A.
(ISPA) in the context of the financing of the high-speed railway
operation;

•       the treatment of payments received from government by
Concessionari d'imposta.

The decisions are in line with the European System of Accounts
(ESA95). The decisions on SCIP and ISPA have been the object of
a consultation of the Committee on Monetary, Financial and
Balance of Payment Statistics (CMFB) and are consistent with its
opinion, as described in annex.

*1. SCIP securitisation operations*

*Background*

In 2001 and 2002, the Italian State undertook two securitisation
operations, called SCIP (Società Cartolarizzazione Immobili

17

Pubblici Srl). SCIP is the name of the Special Purpose Vehicle (SPV) involved in these operations, which concern the sale of a portfolio of buildings owned by the Social Security Funds to the SPV. The majority of the buildings sold to the SPV were rented by households, which were given priority in purchasing the apartments rented, before they could be freely sold on the market.

In April 2004 the Italian Parliament approved a law allowing those tenants who had already expressed in the past, in the context of the SCIP operations, the willingness to purchase the apartment they were living in, to buy it at the price prevailing on the market in 2001, rather than at the current market price at the moment of the sale. The law recognized that tenants, who had purchased apartments between 2001 and 2004, before the law was enacted, should be reimbursed by government for the difference between the price they paid and the 2001 price.

Moreover, the law also established the principle that the SPV which had purchased the real estate assets from government also had the right to be compensated by government, as it was forced, from the moment in which the law was approved, to sell the real estate assets at a price lower than market price (which was the original agreement with government) to certain categories of households. For this purpose government provided a guarantee to the SPV for a loan which the SPV was forced to request from financial institutions, in order to be able to repay the high-rated bonds issued by the SPV and thus maintain their high rating.

### The decision of Eurostat and its impact

In the case of buildings purchased by households before the enactment of the law, and for which the State is now obliged to pay compensation to households, the time of recording of government expenditure (a capital transfer) should be in 2004, when the law was enacted, by the expected amount to be reimbursed by government to households.

In the case of buildings to be purchased by households after enactment of the Law however, the time of recording of government expenditure shall be at the moment of each sale, by the difference between the market price at the moment of the sale and the effective price paid by households.

As a consequence, the deficit of government for the year 2004 is expected to increase by an amount of €182 mn, compared to that reported by the Italian statistical authorities in the March 2005 EDP notification. There would be no impact on the debt.

18

## 2. The role of ISPA in the financing of the high-speed railway

### Background

Infrastrutture S.p.A. (ISPA) is a joint-stock company whose main activity is to provide financial consulting and financial resources directly to private and public enterprises engaged in large public works and/or infrastructure. ISPA is controlled by government and is now classified in the sector of financial auxiliaries outside general government.

ISPA is at present taking care of the entire financing of the construction of a high-speed railway link between Turin, Milan, Rome and Naples (the "High-Velocity/ High-Capacity" project). For this purpose, ISPA raises money on the market by issuing notes and loans. The proceeds are then provided to RFI (Rete Ferroviaria Italiana S.p.A.) and TAV (Treno Alta Velocità S.p.A.) in order to finance the construction of the high-speed railway link.

Following close examination of the balance sheet of ISPA, it was clear that the debt issued by ISPA had to be rerouted either to government or to the railway company, as ISPA was not bearing any risk in this operation.

### The decision of Eurostat and its impact

All the debt issued by ISPA in the context of the construction of the high-speed railway link is to be recorded as government debt. Moreover, the counterpart entry of the debt issued by ISPA is a financial transaction, in the form of a loan from government to RFI-TAV.

If at the moment in which the debt has to be reimbursed by RFI-TAV (that is, at the end of reimbursement of each tranche issued) this will not happen, there will be a debt assumption by government whose counterpart will be a capital transfer from government to RFI-TAV. Capital transfers will be imputed only in those years where a part of the debt will have to be reimbursed, and only for the part that RFI-TAV will not be able to reimburse.

As a consequence, the debt of government in 2004 will increase by an estimated amount of €7.5 bn, equal to 0.6% of GDP. There will be no immediate effect on the deficit of government, except for interest repayments.

### 3. Concessionari d'imposta

It is recalled that, in previous years, government asked the Concessionari d'imposta (mainly banks exercising the function of tax collectors on behalf of the State) to advance to government the payment of taxes to be collected only in the future. The amounts paid to government in this respect were equal to €2 691 mn in 2003 and to €1 460 mn in 2004.

Eurostat decided that the amounts received by Government from Concessionari d'imposta as pre-payments, equal to a fixed percentage (1% for 2003 and 1.5% for 2004) of revenues of previous years, should be recorded as financial transactions (government borrowing) without improving the deficit, as they are not to be considered as revenue. The examination of the balance sheets of banks acting as tax collectors showed that these amounts do not have the nature of a tax, but one of a deposit or guarantee, which would be reimbursable by government. In consequence, the deficit and debt of government is expected to increase by 0.2% of GDP in 2003 and by 0.1% of GDP in 2004 (€1 149 mn out of the €1 460 mn, as some had been already considered as financial transactions by ISTAT).

### 4. Consequences on deficit and debt of government

**As a consequence of the above decisions taken by Eurostat, the government deficit of Italy is now provisionally set at 3.1% of GDP for the year 2003 and at 3.1% of GDP for the year 2004. Government debt in 2003 and 2004 is also provisionally set at 106.5% and 106.6% of GDP respectively.**

### 5. Other outstanding issues

It is recalled that Eurostat was not in a position to validate the figures for Italy in the context of the March 2005 EDP notification. Apart from the three issues mentioned above, this was mainly due to the recording of transactions with the EU budget, to inconsistencies between data on cash and accrual bases and to statistical discrepancies in government accounts. It is expected that Eurostat will shortly receive from the Italian authorities the information requested on these issues and will then be able to clarify these issues in co-operation with ISTAT. Depending on the outcome of the examination, this could lead to a further upward revision in the government deficit for the period between 2001 and 2004.

50. According to the press release, **Eurostat took issue with how Italy accounted for advance tax payments, the securitization of government-owned real estate and the financing of a high-speed railway line. Eurostat concluded that Italy actually incurred a deficit amounting to 3.1% of GDP in both 2003 and 2004, exceeding the EU's 3% limit. Further, Eurostat was reassessing "statistical discrepancies" in Italy that "could lead to a further upward revision in the government deficit for the period between 2001 and 2004."**

51. Following Eurostat's lead, on May 24, 2005, ISTAT revised upwards Italy's budget deficit data to show the country had breached the EU deficit limit during three of the past four years. The revisions were made by ISTAT in collaboration with the Bank of Italy.

52. **ISTAT raised the 2004 deficit to 3.2% of gross domestic product from 3.1% and increased the 2003 deficit to 3.2% of GDP, also from 3.1%, taking the gap further beyond the 3% ceiling imposed by EU rules.** ISTAT also revised the 2002 deficit to 2.7% from 2.6% and the 2001 deficit to 3.2% from 3.0%. The 2000 deficit was revised up to 0.8% of GDP from a previously reported 0.6%.

53. On June 7, 2005, the European Commission approved a report by EU Monetary Affairs Commissioner Joaquin Almunia that said Italy's 2003 and 2004 budget deficits of 3.1% of GDP were neither exceptional nor temporary. The commission further projected Italy's budget deficit at 4% of GDP in 2005, rising to as much as 5% of GDP in 2006. All these figures exceed the 3% deficit ceiling set by the rules underpinning the EU's currency union.

54. According to the European Commission, "This situation ... did not result from an unusual event outside the control of the (Italian) government, nor is it the result of a

21

severe recession." Rather, the high structural deficit is the result of Italy's spendthrift policies, it said.

55. On June 29, 2005, Fitch Ratings lowered Italian debt securities' rating outlook from stable to negative, citing a "marked deterioration" in the nation's growth prospects and its public finances, as well as the government's rising debt.

56. The August 1, 2005 issue of Business Week stated that Italy had in fact violated the 3% deficit-to-GDP ratio in four of the past five years.

57. On August 8, 2005, Standard & Poor's having taken note of the Italian government's year-to-date budget reports, said it appeared "realistic" that Italy was projected to run a 4.3% deficit/GDP ratio for the year and lowered its "Outlook" on Italy's debt from "Stable" to "Negative."

## MATERIAL MISREPRESENTATIONS AND/OR OMISSIONS FROM REGISTRATION STATEMENTS DURING THE CLASS PERIOD

58. During the Class Period, Italy issued a series of registration statements, prospectuses, prospectus supplements, and related filings which inaccurately reported Italy's historical deficits to a material degree.

59. The September 3, 2002 Registration Statement stated that for the year 2001, Italy's net borrowing had been 2.2% of GDP in 2001, and stated that the "target" for 2002 was 1.1%.

60. The January 17, 2003 Shelf Registration incorporated by reference Italy's 2001 Form 18-K and most recent Form 18-K/A filed with the SEC. Italy 2001 Form 18-K/A filed on January 17, 2003 (the same date as the Registration Statement) stated that Italy's net borrowing had been 2.2% of its GDP in 2001.

22

61.     The January 27, 2003 Registration Statement incorporated by reference the January 17, 2003 Form 18-K/A, which contained the representations in ¶ 60 above.

62.     The February 25, 2003 Registration Statement incorporated by reference the January 17, 2003 Form 18-K/A, which contained the representation in ¶ 60 above.

63.     The June 13, 2003 Shelf Registration incorporated by reference Italy's most recent Form 18-K/A filed with the SEC on May 12, 2003. That filing stated that Italy's net borrowing as a percentage of GDP had been 2.6% in 2001, and was "2.3% (estimate)" for 2002.

64.     The July 1, 2003 Registration Statement incorporated by reference the Form 18-K/A Italy filed with the SEC on May 12, 2003, which contained the representation in ¶ 63 above.

65.     The November 7, 2003 Registration Statement incorporated by reference the Form 18-K/A Italy filed with the SEC on September 30, 2003, which stated that Italy's Net Borrowing as a percentage of GDP had been 2.6% in 2001 and 2.3% in 2002.

66.     The December 23, 2003 Shelf Registration incorporated by reference the Form 18-K/A Italy filed with the SEC on September 30, 2003 which contained the representation in ¶ 65 above.

67.     The January 9, 2004 Registration Statement stated that Italy's Net Borrowing as a percentage of GDP had been 2.3% in 2002 and was targeted to be 2.5% in 2003. It also incorporated by reference the Form 18-K/A Italy filed with the SEC on September 30, 2003 which contained the representation in ¶ 65 above.

68.     The February 27, 2004 Registration Statement incorporated by reference the Form 18-K for 2002 that Italy filed with the SEC on February 11, 2004, which stated that Italy's net borrowing as a percentage of GDP had been 2.6% in 2001 and 2.3% in 2002.

23

69.     The June 25, 2004 Registration Statement contained the following table

representing Italy's purported financial performance:

|  | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|
|  |  |  | (millions of euro) |  |  |
| **Current account** |  |  |  |  |  |
| **surplus/(deficit)** | 19,379 | 17,037 | 12,187 | 9,376 | (3,235) |
| *% of GDP* | 1.7% | 1.5% | 1.0% | 0.7% | (0.2)% |
| **Net borrowing** | 19,125 | 7,544 | 32,262 | 28,403 | 31,832 |
| *% of GDP* | 1.7% | 0.6% | 2.6% | 2.3% | 2.4% |
| **Primary balance** | 55,613 | 67,789 | 47,308 | 44,144 | 37,459 |
| *% of GDP* | 5.0% | 5.8% | 3.9% | 3.5% | 2.9% |
| **GDP (nominal** |  |  |  |  |  |
| **value)** | 1,107,994 | 1,166,548 | 1,218,535 | 1,260,428 | 1,300,926 |

and also incorporated by reference the Form 18-K Italy filed with the SEC on February 11, 2004,

which contained the representation in ¶ 68 above.

70.     The January 18, 2005 Registration Statement incorporated by reference

the Form 18-K Italy filed with the SEC on February 11, 2004, which contained the

representation in ¶ 68 above.

71.     Importantly, the entries for the line item on net borrowing each

represented that Italy's net borrowing was below 3% of GDP for all years.

72.     However, such entries in the registration statement referenced in part

above were each materially inaccurate when made, as they materially misreported and/or omitted

the following material facts which then existed, the disclosure of which was necessary to make

such entries or statements not false and/or misleading, including:

        a.      Italy's calculations of net borrowing were and are materially

inaccurate because Italy's implicit government cash borrowing requirements were, in fact, as

follows:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|
| **Implicit government cash borrowing requirement** *(% of GDP)* | 3.0 | 3.5 | 3.4 | 3.5 | 4.3 | 3.9 | 4.1 |

          b.      Italy's calculations of net borrowing were and are inaccurate and/or misleading to the extent that ISTAT (Italy's national statistical office) underreported and continues to underreport the coefficient that reflects declared amounts never collected in the light of past experience, as required by EU legislation;

          c.      Italy's calculations of net borrowing were and are false and/or misleading to the extent that they improperly excluded debt issued by Infrastructure S.p.A. in connection with a high-speed rail link between Turin, Milan, Rome, and Naples; and

          d.      Debt was underreported for 2003 by the improper exclusion of certain tax prepayments as government debt in 2003.

          73.      At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Registration Statements contained materially inaccurate statements about Italy's deficits. These material inaccuracies were the cause and had the effect of creating or maintaining in the market an unrealistically positive assessment of Italy's public finances, thus causing Italy's securities to be overvalued and artificially inflated at all relevant times. The materially inaccurate statements during the Class Period in the Registration Statements and related documents resulted in Plaintiff and other members of the Class

purchasing beneficial interests in Italy's securities at artificially inflated prices. Since the

revelations concerning Italy's debt became known, the value of such securities has declined and

continues to decline, thus causing the damages complained of herein.

## NO SAFE HARBOR

74. The statutory safe harbor provided for forward-looking statements in

§27A of the Act, 15 U.S.C. §77z-1 under certain circumstances does not apply to any of the

allegedly false statements pleaded in this complaint. None of the specific statements pleaded

herein were identified as "forward-looking statements" when made. To the extent there were

any forward-looking statements, there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements.

## BASIS OF ALLEGATIONS

75. Plaintiff's allegations are based upon the investigation of Plaintiff's

counsel, which included a review of SEC filings by Italy and the Underwriters, press releases

and other public statements issued by Italy, media reports about Italy, and other relevant

regulatory filings, correspondence, and reports.

76. The investigation of Plaintiff's counsel has yielded substantial excerpts

from a report for the European Commission containing conclusions of an internal investigation

questioning Italy's reported financial statements, including its reported borrowings. This report

is not publicly available.

## COUNT I

### AGAINST ITALY FOR VIOLATION
### OF SECTION 11 OF THE SECURITIES ACT (15 U.S.C. § 77k)

77.    Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein. Such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiff or members of the Class.

78.    This count is predicated upon Italy's strict liability as an issuer of securities for material inaccuracies and/or omissions in the related Registration Statements.

79.    This count is asserted by Plaintiff against Italy by and on behalf of persons who purchased Italy debt securities covered by such Registration Statements during the Class Period.

80.    The Republic of Italy is strictly liable for each materially false and/or misleading statement and/or omission in the Registration Statements, and has no due diligence defense.

81.    Plaintiff and other members of the Class acquired their beneficial interests in the subject Italy securities without knowledge of the material inaccuracies, errors and/or omissions from the related Registration Statements as alleged herein. Plaintiff and the other members of the Class were thus damaged by Italy's misconduct and by the material misstatements and omissions of the Registration Statements and related documents.

## COUNT II

### AGAINST THE UNDERWRITER DEFENDANTS FOR
### VIOLATION OF SECTION 11 OF THE SECURITIES ACT (15 U.S.C. § 77k)

82.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 - 80 above, as if set forth herein. Such allegations do not allege fraud or the intent of the Underwriters to defraud Plaintiff or members of the Class.

27

83. This count is predicated upon the Underwriters' strict liability for material inaccuracies in the Registration Statements, subject only to a defense that the Underwriter conducted a reasonable investigation and reasonably believed that no material misrepresentation appeared in the Registration Statement.

84. This count is asserted by Plaintiff against the Underwriter Defendants by and on behalf of persons who acquired Italy's debt securities underwritten by one or more of them during the Class Period pursuant to the Registration Statements.

85. The Underwriter Defendants are each underwriters of certain of the Registration Statements. Therefore, each of the Underwriters had a duty to make a reasonable investigation of the statements contained in the Registration Statements to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. Had they exercised due diligence, reasonable care, the Underwriters would have known of the material misstatements and omissions contained in the Registration Statements and also would have known of the omissions of material fact necessary to make the statements made therein not misleading.

86. Each of the Underwriters caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statements which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each Defendant violated Section 11 of the Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection therewith.

87. Each of the Underwriters is liable for the misrepresentations in the Registration Statement(s) where it is listed as lead underwriter, as listed in ¶ 29 above.

88.     Plaintiff and other members of the Class acquired their Italy securities without knowledge of the inaccuracies, errors and/or omissions alleged herein. Plaintiff and the other members of the Class were thus damaged by the Underwriters' misconduct and by the material misstatements and omissions of the aforementioned Registration Statements and other documents.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.     Determining that this action is a proper class action and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:    September 1, 2005

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP

By

Stanley M. Grossman (SG-4544)
Marc I. Gross (MG-8496)
Jason S. Cowart (JC-1437)
100 Park Avenue
New York, NY 10017-5516
(212) 661-1100
(212) 661-8665 (Fax)

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Arthur Stock
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)
-And-
Abbott Leban
(Del Bar No. 3751)
919 N. Market Street
Suite 1400
Wilmington, DE 19801
(302) 571-8626
(302) 571-8602 (Fax)

*Plaintiff's Counsel*

397152.doc

30

### CERTIFICATION OF EMELINA CARMEN AGUAYO IN SUPPORT OF THE CLASS ACTION COMPLAINT

Plaintiff, for her Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.      I have reviewed the facts and allegations of the complaint prepared by counsel and have authorized its filing.  I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel (Berger & Montague LLP) or in order to participate in any private action arising under the federal securities laws.

2.      Below are all of the transactions through my securities account (held jointly with my husband) in debt securities issued by the Republic of Italy during the complaint's class period, *i.e.*, the three years prior to the filing of the complaint:

1/5/05 – purchased $10,000 face amount of CUSIP 465410-BK-3 (ITALY REP DUE 5/15/2009 3.250%) at $98.332 for a total of $9,833.20 - NET AMOUNT $9,882.85

1/31/05 – sold $10,000 face amount of CUSIP 465410-BK-3 (ITALY REP DUE 5/15/2009 3.250%) at $96.899 for a total of $9,689.90 - NET AMOUNT $9,760.32

3.      I believe that my claims against the defendants are typical of those of other members of the class.  I am willing to serve as a representative party on behalf of the class, including providing testimony at depositions and trial.  I intend to pursue this litigation for the best interests of all class members.  During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.  I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: August __31__, 2005          _Emelina C. Aguayo_